# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| OHIO STATE INNOVATION FOUNDATION, | Case No. 25-cv-1393 |
| Plaintiff, | Judge |
| v. | Magistrate Judge |
| ONCOC4 INC., | **COMPLAINT** |
| Defendant. | **DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1. Ohio State Innovation Foundation ("OSIF") brings this lawsuit to remedy a breach of its License Agreement, as amended, with OncoC4, Inc. ("OncoC4"). Following an examination of OncoC4's books and records by an independent certified public accountant, OncoC4 refuses to pay to OSIF more than $12.6 million in sublicense fees – money that could fund ongoing research at The Ohio State University ("OSU"). OncoC4 would suggest that $180 million out of $200 million that it received from a large corporate partner was "specifically designated" for OncoC4 to carry out research in support of their new scientific collaboration, but in fact, there is no evidence that the $180 million was actually designated for that purpose in any way.

## THE PARTIES

2. Plaintiff OSIF is a nonprofit corporation organized under the laws of Ohio. Its principal place of business is located in Columbus, Ohio. OSIF was formed to manage and commercialize intellectual property developed at OSU and is the successor-in-interest to The Ohio State University Research Foundation ("OSURF").

3. Defendant OncoC4 is a privately held corporation organized under the laws of Delaware and maintains its principal executive offices in Rockville, Maryland. OncoC4's

predecessor-in-interest, OncoImmune, Ltd. was an Ohio company with a principal place of business in Columbus, Ohio. OncoImmune, Ltd. was merged into OncoImmune, Inc., an Ohio corporation, in 2005, and later OncoImmune, Inc. was converted to a Delaware corporation. OncoImmune, Ltd. and OncoImmune, Inc. (collectively, "OncoImmune") are both predecessors-in-interest to OncoC4.

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds $75,000 and the parties are citizens of different states.

5. Venue is proper in the Southern District of Ohio, Eastern Division, pursuant to 28 USC §1391(b)(2), as the district and division in which a substantial part of the events or omissions giving rise to the claim occurred.

## FACTUAL BACKGROUND

### THE HISTORY OF INNOVATION AT OSU

6. OSU is a public land-grant research and educational institution that was created by the State of Ohio in 1870. OSU is one of the world's leading public research universities and has been recognized as one of the most innovative universities in the country. In Fiscal Year 2024 alone, OSU spent $1.582 billion on research and development. Its researchers create hundreds of inventions each year, which have resulted in the formation of new businesses and fueled economic growth in this region and throughout the world.

7. OSU's research has led to numerous breakthroughs in medical and scientific fields. Research at OSU has led to improved care for veterans with brain injuries,[1] stronger cybersecurity for factories,[2] and the development of therapeutic agents for cardiovascular diseases.[3] These are just a few examples of the benefits arising from the efforts of OSU researchers.

8. OSU formed OSIF in 2012 to manage and commercialize intellectual property created by OSU researchers and faculty. As a nonprofit corporation, OSIF's commercialization efforts are intended to benefit Ohio industry, commerce, business, and residents by promoting economic opportunity.

9. OSIF is responsible for managing the intellectual property created by or developed at OSU. It is the successor-in-interest to OSURF, the original licensor party to the License Agreement.

10. The revenues that OSIF obtains from commercializing intellectual property created at OSU funds positions for OSU faculty and researchers, as well as their valuable research and technological developments. OSIF's commercialization efforts are also directed toward creating or preserving jobs and employment opportunities in the State of Ohio.

11. In connection with its directive, OSIF has licensed OSU technology created by OSU researchers to hundreds of companies. These licenses typically require licensees to

---

[1] *See Improving care for veterans with brain injuries,* The Ohio State University, https://www.osu.edu/impact/research-and-innovation/veterans-tbi-research (last visited November 21, 2025).

[2] *See Stronger cybersecurity for factories of the future,* The Ohio State University, https://www.osu.edu/impact/research-and-innovation/buck-cybersecurity (last visited November 21, 2025).

[3] *Basking Biosciences Announces Close of $55 Million Financing to Accelerate Clinical Development of First Reversible Thrombolytic for Ischemic Stroke*, The Ohio State University Enterprise for Research, Innovation and Knowledge, https://impact.research.osu.edu/story/basking-biosciences-55m-financing-reversible-thrombolytic-ischemic-stroke (last visited November 21, 2025).

self-report revenues and royalties and other fees due to OSIF based on those revenues. OSIF relies on its licensees to diligently and honestly make these reports, as well as to maintain complete and accurate records. These licenses also typically give OSIF the right to examine and audit those records to determine whether royalties and other fees have been correctly reported and paid.

**OSURF AND ONCOIMMUNE ENTER INTO A LICENSE AGREEMENT**

12. OncoC4 is a privately held biopharmaceutical company co-founded by Yang Liu, PhD, and Pan Zheng, MD, PhD, engaged in the discovery and development of biologics for treatment of cancer. Its lead clinical candidate is ONC-392, an anti-CTLA-4 antibody discovered at OSU that is designed to allow CTLA-4 to recycle and maintain its protective function against autoimmune diseases while enhancing anti-tumor activity.

13. OncoC4's predecessor-in-interest, OncoImmune, was co-founded by Dr. Yang Liu and Dr. Pan Zheng when they were on the faculty of OSU. Dr. Liu was the Kurtz Chair Professor and director of Division of Cancer Immunology, Department of Pathology, at OSU from 1998 to 2006. Dr. Zheng was employed by the Ohio State University Medical Center from 1998 to 2006. OncoC4 was created on December 18, 2020, as a spin-off of OncoImmune, Inc., when the latter was acquired by Merck Sharp & Dhome Corp.

14. OSIF's predecessor-in-interest, OSURF, and OncoC4's predecessor-in-interest, OncoImmune, executed a written license agreement effective August 18, 2004, which was amended on effective dates of April 29, 2009; June 5, 2009; May 1, 2010; April 15, 2015; and May 16, 2018 (collectively, the "License Agreement"). OncoC4 is the successor-in-interest to OncoImmune's rights and obligations under the License Agreement. OSIF is the successor-in-interest to OSURF's rights and obligations under the License Agreement and the first, second, and third amendments thereto; OSIF was the signatory to the fourth and fifth amendments to the License Agreement.

15. The License Agreement, as amended, grants OncoC4 a license to "Biological Materials" developed by OncoC4 utilizing OSIF's Patent Rights as defined in the License Agreement, specifically ONC-392—an anti-cancer compound developed by OncoC4 under the License Agreement.

16. In the fifth and last amendment to the License Agreement ("Fifth Amendment"), OncoC4 agreed to pay OSIF a royalty of seven percent (7%) on any sublicense revenue received from third parties for sublicenses granted to OncoC4's rights in the Biological Materials or ONC-392, while in exchange, OSIF disclaimed any right, title, or interest in ONC-392, "[e]xcept for the right to fees based on SUBLICENSE REVENUE."

17. Sublicensing is commonplace in the life-sciences sector. It allows emerging companies, such as OncoC4, to collaborate with larger, more established companies to further the development of university-created intellectual property. An emerging company, in this case OncoC4, is generally required to pay sublicense fees to the university IP owner as set forth in the underlying license agreement.

18. On May 16, 2018, OSIF and OncoImmune Inc. entered into the Fifth Amendment of the License Agreement. The Fifth Amendment added certain definitions to Article 1 of the License Agreement, including "Biological Materials," "ONC-392," "Sublicense Revenue," and "Sublicenses," and provided, at paragraph 4.3(a), that "for any SUBLICENSES granted by LICENSEE to third parties of LICENSEE'S rights in BIOLOGICAL MATERIALS or ONC-392, LICENSEE will pay to OSIF seven percent (7%) of any SUBLICENSE REVENUE received by LICENSEE or its AFFILIATES therefrom."[4]

---

[4] Exhibit A, License Agreement, 5th Amendment dated May 16, 2018, § 4.3(a).

19. In exchange for this sublicense fee obligation of 7% on Sublicense Revenue for Sublicenses granted by OncoImmune to third parties of its rights in Biological Materials or ONC-392, OSIF disclaimed any right, title, or interest in ONC-392, except for the right to fees based on Sublicense Revenue, and agreed not to challenge OncoImmune's pending patent application relating to ONC-392.[5]

20. The definition of Sublicense Revenue contains an exception for "funds received and specifically designated for research and development of ONC-392 or BIOLOGICAL MATERIALS."[6] "Specifically designated" is not defined.

21. OncoC4, as successor-in-interest to OncoImmune, is required to keep full, true, and accurate books of account containing all particulars necessary to show amounts payable to OSIF, as successor-in-interest to OSURF.[7] Under the Fifth Amendment, OncoC4 is required to make payments on Sublicense Revenue within thirty (30) days of receipt of such Sublicense Revenue, and late payments are subject to monetary penalties.[8]

22. The Fifth Amendment further requires OncoC4 to submit annual reporting to OSIF on licenses or Sublicenses during the preceding twelve months.[9]

### ONCOC4 FORMS A COLLABORATION WITH BIONTECH SE

23. In March 2023, OncoC4 entered into a License and Collaboration Agreement ("LCA") with BioNTech SE ("BioNTech"), a multinational, multi-billion-dollar German biotech company.

---

[5] License Agreement, 5th Amendment, § 7.

[6] License Agreement, 5th Amendment, § 1.10.

[7] Exhibit B, License Agreement dated August 18, 2004, § 6.1.

[8] License Agreement, 5th Amendment, § 4.3(b).

[9] License Agreement, 5th Amendment, § 6.2.

24. BioNTech agreed to make an upfront payment of two hundred million dollars ($200,000,000) to OncoC4 in exchange for an exclusive license to products, patents, and know-how relating to ONC-392, with the objective of co-developing and commercializing biopharmaceutical preparations containing ONC-392. Under the LCA, OncoC4 is eligible to receive development, regulatory, and commercial milestone payments, as well as double-digit tiered royalties.[10] BioNTech has since invested at least an additional $30 million in OncoC4, in the form of a milestone payment under the LCA.

25. The License Agreement between OncoC4 and OSIF, including all five amendments, was scheduled in the LCA as an "upstream agreement" for which BioNTech and OncoC4 agreed that OncoC4 would be solely responsible for payments due to the licensor OSIF as a result of the sublicense granted to BioNTech under the LCA. Scheduling of the License Agreement in the LCA demonstrates that OncoC4 and BioNTech were both aware of the obligations imposed on OncoC4 regarding Sublicense Revenue due to OSIF for sublicensing of ONC-392 under the Fifth Amendment.

26. OncoC4 did not pay OSIF any sublicensing fees in the months following its receipt of the $200 million in Sublicense Revenue from BioNTech relating to the sublicensing of ONC-392 to BioNTech.

---

[10] Exhibit C, March 20, 2023, Press Release, "BioNTech and OncoC4 Announce Strategic Collaboration to Co-Develop and Commercialize Novel Checkpoint Antibody in Multiple Solid Tumor Indications," available at https://oncoc4.com/press-releases/biontech-and-oncoc4-announce-strategic-collaboration-to-co-develop-and-commercialize-novel-checkpoint-antibody-in-multiple-solid-tumor-indications/ (last visited November 21, 2025).

**ONCOC4 FORCES OSIF TO CONDUCT A FORMAL INSPECTION, WHICH CONCLUDES THAT OSIF IS OWED MILLIONS OF DOLLARS**

27. Paragraph 7.1 of the LCA between OncoC4 and BioNTech recites that $180 million of the $200 million upfront payment was paid "in consideration for and shall fund the performance by OncoC4 of its activities to research and Develop ONC-392."

28. OSIF contacted OncoC4 in October 2023 to request supporting documentation or calculations to support this purported apportionment.

29. In November 2023, OncoC4 advised OSIF that insofar as the LCA obligated it to fund development under a joint clinical development plan with BioNTech, the $180 million was intended to fund its half of the development costs. OncoC4 further claimed that the apportionment of $180 million was based on offers from other potential development partners, and advice from OncoC4's investment banker and tax advisor.

30. The term "funds *received and specifically designated* for research and development of ONC-392 and BIOLOGICAL MATERIALS"[11] in the exclusion to the definition of "Sublicense Revenue" cannot, under any interpretation, refer to unrestricted cash payments as consideration for a sublicense grant to ONC-392. The funds were not actually segregated, "received," or "designated" in any meaningful way, nor were they in fact spent by OncoC4 in accordance with any such designation. Thus, OncoC4 is required under the Fifth Amendment to pay OSIF the 7% fee on Sublicensing Revenue on the entire $200 million upfront payment.

31. The discussions and correspondence between OncoC4 and OSIF having failed to resolve the dispute, OSIF was forced to request that an independent investigator undertake an examination of OncoC4's books and records to determine whether the $180 million apportionment

---

[11] License Agreement, 5th Amend., § 1.10 (emphasis added).

8

of the $200 million upfront payment from BioNTech falls within the exclusion from the definition of Sublicense Revenue by being "specifically designated for research and development of ONC-392."

32. OSIF requested an inspection of OncoC4's books and records to determine whether the allocation of only $20 million of the $200 million upfront payment as Sublicense Revenue under the License Agreement was supported, and to ensure OncoC4's compliance with its financial obligations under the Fifth Amendment. An inspection was carried out by Doug Aguilera, CPA/CFF, CFE, CGMA, and involved review of the License Agreement, the LCA, correspondence between the parties, the audited financial statements of OncoC4 from 2021 and 2022 and draft audited financial statements of OncoC4 from 2022 and 2023; LCA clinical development plans and budgets; a valuation report with estimated ONC-392 sales prepared during the LCA negotiations; and interviews with OncoC4 employees and counsel.

33. Importantly, the financial inspection report, dated November 27, 2024, found no contemporaneous documentation supporting OncoC4's allocation of just $20 million of the upfront $200 million payment as Sublicense Revenue; found that OncoC4's treatment and use of the remaining $180 million was not "specifically designated" for research and development, had not been segregated from OncoC4's general operating funds, and in fact, appeared to have been spent on things other than research and development; and concluded that a sublicense fee should have been paid to OSIF on the entire $200 million received under the LCA at the agreed rate of 7%, or $14,000,000.

34. As detailed in the inspection report, sublicense fees are also due to OSIF on BioNTech's reimbursements to OncoC4 for costs exceeding the 50/50 share of full-time employee ("FTE") costs for research and development under the LCA. The investigator ascertained that

9

OncoC4 owes OSIF an additional $69,939 on these FTE reimbursements exceeding its 50% R&D collaboration commitment for the period Q2 2023 through Q1 2024, with additional sublicense fees to be determined.

35. On December 18, 2024, OncoC4, through its outside counsel, responded to OSIF regarding the Inspection Report and summarily stated that "OncoC4 disputes the conclusions therein, including for the reasons stated in its prior correspondence and its other communications with OSIF and its representatives."

### ONCOC4 UNDERPAYS OSIF FOR SUBLICENSE REVENUE

36. On or about December 17, 2024, OncoC4 remitted payment of $3,503,500 to OSIF, asserting that this amount represented the amount due to OSIF under Section 4.3 of the License Agreement, and disputing that any additional payments are due to OSIF under the License Agreement. This payment comprised $1.4 million as a sublicense fee for $20 million of the $200 million upfront payment; $2.1 million as a sublicense fee on a milestone payment of $30 million; and $3,500 as a sublicense fee on a $50,000 license extension fee payment from a different sublicensee.

37. OSIF has made every effort to resolve this matter amicably and informally, but additional discussion between the parties did not result in any resolution.

### **ONCOC4 HAS BREACHED ITS OBLIGATIONS UNDER THE LICENSE AGREEMENT**

38. OncoC4 has taken the position that the License Agreement, in the definition of "Sublicense Revenue" at section 1.10 of the Fifth Amendment, excludes "funds received and specifically designated for research and development of ONC-392 or Biological Materials," such that the 7% fee on Sublicense Revenue received by it from BioNTech applies only to $20 million of the $200 million upfront payment.

10

39. OncoC4 has never provided documentation, explanation, or substantiation that the $180 million specified in Section 7.1 of the LCA as being "in consideration for" and to "fund" OncoC4's research and development activities was actually "designated" for or restricted to that purpose in any way. The LCA does not impose any obligation on OncoC4 to maintain segregated accounts, use any portion of the $200 million upfront fee toward funding its joint development costs, or keep a cash reserve to meet its obligation to maintain sufficient assets to fund six months of joint development costs with BioNTech. The investigator's inspection of OncoC4's books and records revealed that far from the entire $180 million actually being "specifically designated" for research and development, *at least* $80 million of the $180 million apportionment was actually used for operations—*not* research and development. There is no basis for OncoC4's contention that $180 million of the $200 million upfront payment was "specifically designated" for research and development of ONC-392.

40. The inspector concluded that there was no evidence to support OncoC4's position, and OncoC4's outside counsel who had negotiated the LCA admitted to the inspector that the LCA language pertaining to the $180 million portion of the upfront payment was purposefully meant to reflect the License Agreement's language defining Sublicense Revenue to exclude "funds received and specifically designated for research and development of ONC-392."

41. OncoC4 has conceded that under the License Agreement, it is required to pay OSIF seven percent of $20 million, or $1.4 million, acknowledging that the upfront payment from BioNTech for a sublicense to ONC-392 falls within the License Agreement's obligation on OncoC4 to pay Sublicense Revenue to OSIF.

11

42. OncoC4 has also conceded that any milestone payments from BioNTech under the LCA constitute Sublicense Revenue on which it must pay OSIF seven percent in sublicense fees on 100% of such milestone payments.

43. OncoC4 is also responsible for the fees associated with the inspection report, which amounted to $28,000, under Section 6.1 of the License Agreement.

44. $12,600,00 remains outstanding and due to OSIF on the $200 million upfront payment from BioNTech to OncoC4 as Sublicense Revenue, as OncoC4 has failed to demonstrate that the $180 million of the upfront payment was "specifically designated for research and development of ONC-392." OncoC4 has refused to pay sublicense fees to OSIF for the excess FTE reimbursement, and the costs of the inspection report.

45. Accordingly, in view of OSIF's role as the manager of intellectual property created at OSU, and the responsibility OSIF has to share intellectual property commercialization proceeds with OSU for distribution to creators and support of OSU research, OSIF is now forced to file this lawsuit to remedy OncoC4's breaches of contract.

<u>COUNT I</u>
<u>BREACH OF CONTRACT (REPORTING REQUIREMENTS)</u>
<u>AGAINST DEFENDANT ONCOC4, INC.</u>

46. OSIF repeats and realleges each and every one of the foregoing allegations as though fully set forth herein.

47. The License Agreement between OSIF and OncoC4 is a valid and enforceable contract.

48. OSIF has not materially breached and has substantially performed all its obligations under the License Agreement at all relevant times. All conditions precedent to the filing of this litigation have occurred or have been performed.

49. As described above, OncoC4 was entrusted with the ability and obligation to make payments on Sublicense Revenue within thirty days of receipt of such Sublicense Revenue under the License Agreement, and to provide annual written reports on or before September 1 of each year on licenses or Sublicenses in the preceding twelve months.

50. OncoC4 failed to timely report or pay the fees due on the Sublicense Revenue generated by the $200 million upfront payment to OncoC4 by BioNTech.

51. Due to OncoC4's breaches, OSIF has suffered damages in an amount to be determined at trial.

### COUNT II
### BREACH OF CONTRACT (FAILURE TO PAY SUBLICENSING FEES ON FULL BIONTECH PAYMENTS) AGAINST DEFENDANT ONCOC4, INC.

52. OSIF repeats and realleges each and every one of the foregoing allegations as though fully set forth herein.

53. The License Agreement between OSIF and OncoC4 is a valid and enforceable contract.

54. OSIF has not materially breached and has substantially performed all its obligations under the License Agreement at all relevant times. All conditions precedent to the filing of this litigation have occurred or have been performed.

55. As described in the allegations above, OncoC4 materially breached Section 4.3 of the License Agreement without legal excuse or justification. The License Agreement does not permit OncoC4 or its sublicensees to unilaterally allocate consideration between "research and development" in name only in order to avoid paying fees on Sublicense Revenue. As confirmed by the investigator's report, by improperly labeling $180 million of BioNTech's unrestricted consideration as being for research and development of ONC-392, OncoC4 failed to pay the full

13

amount of sublicensing fees owed on the $200 million in cash that it received from BioNTech as an upfront payment in exchange for an exclusive license to ONC-392.

56. Due to OncoC4's breaches, OSIF has suffered damages in an amount to be determined at trial, but no less than $12,600,000 in underpayment on the $200 million received from BioNTech, plus contractual late-payment fees and applicable interest.

<u>COUNT III</u>
<u>BREACH OF CONTRACT (FAILURE TO ALLOCATE CONSIDERATION IN GOOD FAITH) AGAINST DEFENDANT ONCOC4, INC.</u>

57. This count is pled in the alternative to Count II. OSIF repeats and realleges each and every one of the foregoing allegations as though fully set forth herein, with the exception of those allegations set forth in Count II.

58. The License Agreement between OSIF and OncoC4 is a valid and enforceable contract.

59. OSIF has not materially breached, and has substantially performed all of its obligations under, the License Agreement at all relevant times. All conditions precedent to the filing of this litigation have occurred or have been performed.

60. OncoC4 asserts that the allocation in section 7.1 of the LCA, obligating BioNtech to pay OncoC4 a non-refundable, creditable, one-time payment in the amount of two hundred million Dollars ($200,000,000), "of which one hundred million Dollars ($180,000,000) is in consideration for and shall fund the performance by OncoC4 of its activities to research and Develop ONC-392 under the CDP," means that $180,000,00 of the upfront payment does not constitute Sublicense Revenue under section 1.10 of the License Agreement, which excludes "funds received and specifically designated for research and development of ONC-392 or BIOLOGICAL MATERIALS."

14

61. This "designation" in the LCA was illusory, made only for the purpose of avoiding payment of fees on Sublicense Revenue to OSIF, and not supported or required by the OncoC4's obligations under the LCA or OncoC4's actual treatment of the $180 million following the payment of the money by BioNTech.

62. By introducing this illusory "designation" in name only of $180 million of the $200 million upfront payment from BioNTech as "in consideration for and [to] fund the performance by OncoC4 of its activities to research and Develop ONC-392," OncoC4 breached the duty of good faith and fair dealing inherent in those provisions and under the License Agreement by allocating only 10% of the total upfront payment as Sublicense Revenue under the License Agreement.

63. Due to OncoC4's breach, OSIF has suffered damages in an amount to be determined at trial, but in no event less than $12,600,000 in underpayment on the $200 million received from BioNTech, plus contractual late-payment fees and applicable interest.

<u>COUNT IV</u>
<u>BREACH OF CONTRACT (FAILURE TO PAY SUBLICENSING REVENUE FEES ON FTE PROFIT)
AGAINST DEFENDANT ONCOC4, INC.</u>

64. OSIF repeats and realleges each and every one of the foregoing allegations as though fully set forth herein.

65. The License Agreement between OSIF and OncoC4 is a valid and enforceable contract.

66. OSIF has not materially breached and has substantially performed all of its obligations under the License Agreement at all relevant times. All conditions precedent to the filing of this litigation have occurred or have been performed.

67. As described above, OncoC4 materially breached Section 4.3 of the License Agreement without legal excuse or justification by failing to pay sublicensing fees on the profits

15

realized by OncoC4 due to BioNTech's reimbursements of FTE employees to OncoC4 at a rate exceeding the 50/50 split for such costs required by the LCA.

68. Due to OncoC4's breaches, OSIF has thus suffered damages in an amount to be determined at trial, but no less than $69,939 through the first quarter of 2024, plus any additional damages suffered through the remainder of 2024 and 2025, plus any additional contractual late-payment fees and applicable interest.

## COUNT V
## BREACH OF CONTRACT (FAILURE TO PAY COSTS) AGAINST DEFENDANT ONCOC4, INC.

69. OSIF repeats and realleges each and every one of the foregoing allegations as though fully set forth herein.

70. The License Agreement between OSIF and OncoC4 is a valid and enforceable contract.

71. OSIF has not materially breached, and has substantially performed all of its obligations under, the License Agreement at all relevant times. All conditions precedent to the filing of this litigation have occurred or have been performed.

72. OncoC4 has materially breached Section 6.1 of the License Agreement without legal excuse or justification and/or breached the duty of good faith and fair dealing inherent in those provisions. Section 6.1 provides that OSIF, as successor-in-interest to OSURF, may inspect OncoC4's books and records, and if such inspection leads to the discovery of a discrepancy in reporting which is greater than five percent (5%) to OSURF's (now OSIF's) detriment, OncoC4 is obligated to pay the reasonable costs of such inspection.

73. Here, the investigator retained by OSIF incurred approximately $28,000 in reasonable costs of inspection and providing the report, which found that OncoC4 was liable for Sublicense Revenue payments of $14,000,000 on the $200,000,000 upfront payment by

16

BioNTech, far more than the $1.4 million OncoC4 contended it was liable in fees on Sublicense Revenue under the License Agreement, and exceeding a 5% detriment to OSIF.

74. Due to OncoC4's breaches, OSIF has suffered damages in an amount to be determined at trial, including at least the $28,000 incurred by the investigator in carrying out the investigation and preparing the report, plus any applicable interest and fees.

## PRAYER FOR RELIEF

Wherefore, OSIF respectfully requests that this Court grant the following relief:

75. Compensatory damages in an amount to be determined at trial;

76. Pre-judgment and post-judgment interest at the highest rate allowable by contract or by law;

77. An order that OncoC4 specifically performs its obligations under the License Agreement, including but not limited to that it pays a 7% Sublicense Revenue fee on the full $200 million upfront payment it received as consideration by BioNTech for the sublicense to ONC-392;

78. Any Sublicense Revenue fees due and payable for any other monies received by OncoC4, including but not limited to the FTE reimbursements it receives from BioNTech that exceed the 50/50 allocation of that cost as between OncoC4 and BioNTech;

79. The costs of the investigator's investigation relating to the Sublicense Revenue and OncoC4's allocation and failure to pay same;

80. All reasonable costs incurred herein;

81. The costs of this collection action, including attorneys' fees in an amount to be established at trial; and

82. Such other relief as the Court deems just and proper.

17

## **JURY DEMAND**

OSIF demands a trial by jury as to all issues triable of right.

Dated: November 26, 2025,	Respectfully submitted,

	By: /s/ *Aneca E. Lasley*
	Aneca E. Lasley, Trial Attorney (0072366)
	*aneca.lasley@icemiller.com*
	ICE MILLER LLP
	250 West Street, Suite 700
	Columbus, Ohio 43215-7509
	(t) 614-462-1085
	(f) 614-462-5135

	*Attorney for Plaintiff OSIF*