**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**OHIO STATE INNOVATION FOUNDATION,**

**Plaintiff,**

**v.**

**ONCOC4, INC.,**

**Defendant.**

**Case Number 2:25-cv-1393**
**Judge Edmund A. Sargus, Jr.**
**Magistrate Judge Kimberly A. Jolson**

**OPINION AND ORDER**

This matter is before the Court on Defendant OncoC4, Inc.'s Partial Motion to Dismiss for Failure to State a Claim. (ECF No. 10.) Plaintiff Ohio State Innovation Foundation filed a response in opposition (ECF No. 24), and OncoC4 filed a reply in support (ECF No. 25). For the reasons stated below, OncoC4's Motion is **GRANTED in part** and **DENIED in part**.

**BACKGROUND**

Plaintiff Ohio State Innovation Foundation ("OSIF") is a nonprofit organization formed to manage and commercialize intellectual property developed at The Ohio State University ("OSU"). (ECF No. 1, ¶ 2.) OncoC4 is a corporation engaged in the discovery and development of cancer treatment medications. (*Id.* ¶ 12.) OncoC4's predecessor-in-interest was founded by Dr. Yang Liu and Dr. Pan Zheng when they were faculty members at OSU. (*Id.* ¶ 13.) OncoC4's lead clinical candidate is ONC-392, an anti-cancer compound discovered at OSU. (*Id.* ¶¶ 12, 15.)

OSIF's predecessor-in-interest and OncoC4's predecessor-in-interest entered into a written License Agreement effective August 2004, when Dr. Liu and Dr. Zheng were still OSU faculty, that has been amended over the years. (*Id.* ¶¶ 13–14.) The License Agreement grants OncoC4 a license to ONC-392. (*Id.* ¶ 15.) The most recent amendment to the License Agreement

requires OncoC4 to pay OSIF a royalty of 7% on any "sublicense revenue" it received from sublicensing its rights in ONC-392. (*Id.* ¶ 16.) The defined term "Sublicense Revenue" excludes "funds received and specifically designated for research and development of ONC-392." (*Id.* ¶ 20.) The License Agreement also requires OncoC4 to submit annual reporting to OSIF and, under certain circumstances, pay for an inspection of its books and records. (*Id.* ¶¶ 22, 43.)

In March 2023, OncoC4 entered into a Sublicense Agreement[1] with non-party BioNTech SE, a German biotech company, for the purpose of co-developing and commercializing cancer medications using ONC-392. (*Id.* ¶¶ 23–24.) In exchange for an exclusive license to ONC-392, BioNTech agreed to make an upfront payment of $200 million to OncoC4. (*Id.* ¶ 24.) OSIF alleges that it is entitled to a 7% royalty payment on the full $200 million payment as a sublicense fee under the License Agreement. (*Id.* ¶ 30.) OncoC4 paid the sublicense fee on $20 million but asserts it does not owe a sublicense fee on the remaining $180 million. (*Id.* ¶¶ 27, 31, 36.) OncoC4 contends the $180 million is excluded from the definition of "sublicense revenue" as "funds received and specifically designated for research and development of ONC-392." (*See id.* ¶¶ 1, 30–31.)

Because of the dispute, OSIF requested a formal inspection of OncoC4's books and records. (*Id.* ¶ 32.) According to OSIF, the inspection found that "OncoC4's treatment and use of the remaining $180 million was not 'specifically designated' for research and development, had not been segregated from OncoC4's general operating funds, and in fact, appeared to have been spent on things other than research and development." (*Id.* ¶ 33.) Specifically, it alleges that at least $80 million of the funds was actually used for operations and not research and

[1] The agreement is titled "License and Collaboration Agreement" (ECF No. 10-1), but the Court refers to it as the "Sublicense Agreement" in this Opinion and Order for ease of reference and understanding.

development. (*Id.* ¶ 39.) The report also found that OncoC4 owes sublicense fees on BioNTech's reimbursements for costs on full-time employees, as required by the License Agreement. (*Id.* ¶ 34.) OncoC4 informed OSIF that it disputes the conclusions of the inspection. (*Id.* ¶ 35.)

OSIF initiated this action bringing five breach-of-contract claims against OncoC4: (I) breach of contract (reporting requirement); (II) breach of contract (failure to pay sublicensing fee on full BioNTech payments); (III) breach of contract (failure to allocate consideration in good faith); (IV) breach of contract (failure to pay sublicensing revenue fees on full-time employees profit); and (V) breach of contract (failure to pay costs). (*See generally id.*) OSIF alleges OncoC4 owes it $12.6 million on Count II, $69,939 on Count IV, and $28,000 on Count V. (*Id.* ¶¶ 56, 68, 74.)

OncoC4 filed its Partial Motion to Dismiss on Counts I, II, III, and V of the Complaint for failure to plausibly allege a breach of the License Agreement. (ECF No. 10, PageID 85.) OSIF filed a response in opposition (ECF No. 24), and OncoC4 filed a reply in support (ECF No. 25).

**LEGAL STANDARD**

To state a claim upon which relief can be granted, a plaintiff must satisfy the pleading requirements set forth in Federal Rule of Civil Procedure 8(a), which requires a pleading to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Accordingly, "[t]o survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v Twombly*, 550 U.S. 554, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged." *Id*. at 678 (clarifying the plausibility standard from *Twombly*, 550 U.S. at 556). Furthermore, "[a]lthough for the purposes of a motion to dismiss [a court] must take all of the factual allegations in the complaint as true, '[the court is] not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id*. (quoting *Twombly*, 550 U.S. at 555) (internal quotations omitted).

"When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (citing *Amini v. Oberlin Coll.*, 259 F.3d 493, 502 (6th Cir. 2001)).

## ANALYSIS

OncoC4 asserts that Count II fails to state a claim for relief because it has satisfied its payment obligations under the License Agreement and as a result, Counts I and V also fail. (ECF No. 10, PageID 85.) Further, it argues that Count III is barred because there is no independent cause of action for breach of the implied duty of good faith and fair dealing under Ohio law. (*Id.* PageID 92.)

### I. Count II – Breach of Contract for Failure to Pay Full Sublicensing Fee

In Count II, OSIF alleges that OncoC4 breached the License Agreement by not paying the sublicensing fee on $180 million. (ECF No. 1, ¶ 55.) Under the most recent Amendment to the License Agreement, OncoC4 must pay OSIF a 7% royalty fee of any "sublicense revenue" it receives for sublicensing its rights in ONC-392. (ECF No. 1-1, ¶ 4.3(a).) "Sublicense revenue" is defined as:

> [T]he gross amount of consideration received by [OncoC4] for the grant of any SUBLICENSE under Section 4.3(a) below, *other than funds received and specifically designated for research and development of ONC-392* or BIOLOGICAL MATERIALS. For the avoidance of doubt, equity received as consideration specifically excludes any equity investment in [OncoC4] or its AFFILIATES.

(*Id.* ¶ 1.10 (italicized emphasis added).)

In turn, OncoC4's Sublicense Agreement with BioNTech provides that BioNTech will pay it $200 million—$180 million[2] of which "is in consideration for and shall fund the performance by OncoC4 of its activities to *research and Develop ONC-392*." (ECF No. 10-1, ¶ 7.1, PageID 169 (italicized emphasis added).)

The parties dispute whether the $180 million is "sublicense revenue" on which OncoC4 must pay the sublicense fee or whether it falls into the "funds received and specifically designated for research and development" exception (the "R&D Exception"). (*See* ECF No. 1-1, ¶ 1.10.)

Under Ohio law,[3] the primary rule for contract interpretation is to "give effect to the intentions of the parties as expressed in the language of their written agreement." *Sutton Bank v. Progressive Polymers, L.L.C.*, 163 N.E.3d 546, 552 (Ohio 2020). To that end, courts must "examine the contract as a whole and presume that the intent of the parties is reflected in the language of the contract." *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 361 (6th

[2] The copy of the Sublicense Agreement provided to the Court contains a placeholder ("[***]") instead of "$180 million." (ECF No. 10-1, ¶ 7.1, PageID 169.) Because the parties do not dispute the $180 million figure, the Court refers to that amount here.

[3] The parties cite Ohio law in their filings, but do not explain why Ohio law applies. (*See* ECF No. 10, PageID 84; ECF No. 24, PageID 292.) Upon review, the License Agreement designates Ohio law as the choice-of law for this type of dispute. (ECF No. 1-2, ¶ 14.1, PageID 45.) Accordingly, the Court applies Ohio law. *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008) ("When interpreting contracts in a diversity action, [federal courts] . . . generally enforce the parties' contractual choice of governing law.").

Cir. 2014) (quoting *Sunoco, Inc. (R & M) v. Toledo Edison Co*., 953 N.E.2d 285, 292 (Ohio 2011)). Common words are "given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Sutton Bank*, 163 N.E.3d at 552 (quoting *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, syllabus (Ohio 1978)). Additionally, courts must presume that words are used for a specific purpose and avoid interpretations that render words meaningless or unnecessary. *Wohl v. Swinney*, 888 N.E.2d 1062, 1066 (Ohio 2008).

"Interpreting written contract terms, including whether those terms are ambiguous, is a matter of law to be determined by the court." *New Lansing Gardens Hous. Ltd. P'ship v. Columbus Metro. Hous. Auth.*, 46 F.4th 514, 520 (6th Cir. 2022). A provision is ambiguous when it is "susceptible of more than one reasonable interpretation." *Eastham*, 754 F.3d at 361 (quoting *Lager v. Miller-Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008)).

OncoC4 argues that the $180 million falls into the R&D exception by focusing on the definition of "designated." (ECF No. 10, PageID 87.) Specifically, it argues that the $180 million falls into the R&D Exception because the Sublicense Agreement "chooses" or "denominates" $180 million for the "particular purpose" of funding research and development activities. (*Id.*) But OncoC4's interpretation overlooks the other words in the R&D Exception.

Reviewing the R&D Exception as a whole, the Court finds that "received and specifically designated" must mean something more than "designated" in name alone. For one, to satisfy the exception, the funds must be "received *and* specifically designated for research and development." The word "and" indicates that mere receipt of the funds for research and development purposes is not enough—something more must occur to satisfy the exclusion. Further, the text states that the funds must be "*specifically* designated." Thus, even accepting

OncoC4's definition of "designated" as chosen or denominated for a particular purpose, the word "specifically" modifies it to mean something more than merely "designated." Accordingly, simply "designating" the funds for research and development in the Sublicense Agreement cannot satisfy the R&D Exception—something more must occur to specifically designate them for that purpose. To find otherwise would render the words "received and specifically" meaningless. *See Wohl*, 888 N.E.2d at 1066 ("When interpreting a contract, we will presume that words are used for a specific purpose and will avoid interpretations that render portions meaningless or unnecessary."); *see also State ex rel. Harris v. Rubino*, 119 N.E. 3d 1238, 1245 (Ohio 2018) (stating that a court construing a contract may not ignore the existence of any word or phrase).

OSIF alleges in its Complaint that OncoC4 did not "specifically designate" the funds for research and development because the funds were not segregated, or designated in any meaningful way, from other funds and appear to have been partially spent on things other than research and development. (ECF No. 1, ¶¶ 30, 32, 39.) OncoC4 counters that such an interpretation reads terms into the contract that are not there, specifically "additional accounting obligations," and such a result would be absurd without an actual contractual mandate. (ECF No. 10, PageID 88.) OncoC4 is correct that the License Agreement does not specify what would satisfy the "specifically designated" portion of the R&D Exception. At this stage, however, the Court need not consider what would satisfy the "specifically designated" requirement. The only finding the Court makes at this stage is that "received and specifically designated" means something more than "designated" for research and development in name alone.

OncoC4 further argues that nothing in the License Agreement requires research and development funds to be spent within a certain timeframe to be considered "specifically

designated." (ECF No. 10, PageID 89.) This argument misconstrues the Complaint. OSIF does not allege that the funds have not been spent for research and development, but that they were not "specifically designated" for research and development and that some funds have been spent for things other than research and development. (ECF No. 1, ¶¶ 30, 39.) Thus, that argument does not warrant dismissal.

To sum, the Court finds that "received and specifically designated" in the R&D Exception must mean something more than "designated" for research and development in name alone. OSIF sufficiently alleges that OncoC4 did not do enough to "specifically designate" the funds for research and development to fall into the R&D Exception. Accordingly, at this stage, OSIF has sufficiently pled its breach-of-contract claim for failure to pay the full sublicensing fee.

## II. Counts I and V – Breach of Contract for Failure to Comply with Reporting Requirement and for Failure to Pay the Inspection Cost

The Court turns to Counts I and V, which flow out of Count II. Count I is for breach of contract for failure to comply with the reporting requirement. Count V is for failure to pay the cost of the inspection. (ECF No. 1, ¶¶ 50, 73.)

OSIF moves to dismiss both counts on the basis that it satisfied its contractual obligations and cannot be liable for failure to report and does not owe for the audit. (ECF No. 10, PageID 91–92.) Because the Court finds above that OSIF sufficiently pled a breach-of-contract claim for failure to pay the full sublicensing fee in Count II, OncoC4's arguments fail and Counts I and V may proceed.

## III. Count III – Breach of Contract for Failure to Allocate Consideration in Good Faith

OSIF pleads Count III in the alternative to Count II. (ECF No. 1, ¶ 57.) In Count III, OSIF alleges that OncoC4 breached its duty of good faith and fair dealing by including an

illusory designation in the Sublicense Agreement for the purpose of avoiding paying the full sublicense fee. (*Id.* ¶¶ 60–62.)

OncoC4 moves to dismiss Count III because Ohio law does not provide for an independent cause of action for breach of the implied duty of good faith and fair dealing. (ECF No. 10, PageID 92–93.) Alternatively, it moves to dismiss the claim on the basis that it complied with its contractual obligations. (*Id.* PageID 93–94.)

Ohio law imposes an implied duty of good faith on parties to a contract that requires "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Wendy's Int'l, Inc. v. Saverin*, 337 F. App'x 471, 476 (6th Cir. 2009) (quoting *Littlejohn v. Parrish*, 839 N.E.2d 49, 54 (Ohio 2005)). But "there is no violation of the implied duty unless there is a breach of a specific obligation imposed by the contract, such as one that permits a party to exercise discretion in performing a contractual duty or in rejecting the other party's performance." *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018). Thus, Ohio courts do not recognize an independent cause of action for breach of the implied duty of good faith and fair dealing apart from a breach of the contract. *Id.*; *see also Wendy's*, 337 F. App'x at 476.

Because Count III is pled in the alternative, it cannot stand as an independent claim absent a breach of a specific obligation imposed by the contract. Thus, if OncoC4 did not breach the License Agreement, OSIF cannot maintain a separate claim for breach of the implied duty of good faith and fair dealing. Put simply, Count III could not proceed in the alternative to Count II. *Amicus Miami of Ohio, LLC v. Kacachos*, No. 1:22-cv-00355, 2025 WL 2687592, at *19 (S.D. Ohio Sept. 19, 2025) (Hopkins, J.); *Ironshore Indem., Inc. v. Evenflo Co.*, No. 24-3792, 2025 WL 1356414, at *4 (6th Cir. Apr. 25, 2025).

OSIF contends that Count III alleges that OncoC4 abused its discretion under the License Agreement to designate the purpose of its funding in good faith. (ECF No. 24, PageID 292 (citing *Lucarell*, 97 N.E.3d at 469).) But OSIF does not plead in Count III a breach separate from Count II. (*See* ECF No. 1, ¶¶ 57–63.) And as explained above, Count III is pled in the alternative to Count II, and Count III cannot stand on its own without a "successful breach of contract claim." *Ironshore*, 2025 WL 1356414, at *4.

For the reasons explained above, Count III is **DISMISSED**.

## CONCLUSION

For the reasons stated in this Opinion and Order, the Court **GRANTS in part** and **DENIES in part** (ECF No. 10) Defendant OncoC4, Inc.'s Amended Motion to Dismiss for Failure to State a Claim. Plaintiff's Count III is **DISMISSED** with prejudice. All other claims remain.

This case remains open.

**IT IS SO ORDERED.**

**9/23/2026**
**DATE**

**s/Edmund A. Sargus, Jr.**
**EDMUND A. SARGUS, JR.**
**UNITED STATES DISTRICT JUDGE**